Please call the next case. 13-28-58 Hue-Liu v. City of Edison Good morning. May it please the Court. My name is Jose Rivera. I represent the appellant, Hue-Liu, in this matter. This case is another repetitive trauma case. The arbitrator and the Commission had both declined to award benefits in this matter, finding that the petitioner failed to meet its burden, proving that her work activities caused her condition, her arm tear. While traditionally this type of issue is looked through the prism of the manifest wage standard, we are taking the further position that the Commission in this case applied the wrong legal standard. They did so when they required that the petitioner, to meet its burden, provide quantitative components to her job. That is, specifically prove how many, how often she was doing the type of work that she claims. So what's wrong with that? Well, according to the Darling case, that is increasing the burden of proof. No. Justice Hall. If one expert can turn around and say, look, if she did this 50 times a day, we could have repetitive trauma. If she did it only once a day, there's no causal connection here. So why shouldn't she have to prove how many times a day she did it? Because that's what repetitive trauma is about. I mean, it is quantifiable. I mean, repetitive means more, means frequently, doesn't it? Well, in this case, it's not, we're not, the theory of the case isn't that over the 14 years she was working as a shelver, that this is what precipitated the symptomology. In fact, while it is a repetitive trauma case, this is about as close to a specific incident as you're going to get. The stacks in the library doubled up. The books were tighter. This caused an onset of symptoms, as evidenced by the medical records. Where did the tightly packed books, where did that part of the scenario, who did that come from? Who testified as to that? The Petitioner. The Petitioner testified to that. And that's not, that history is not in any of the claimants' medical records leading up to arbitration, is it? No, Your Honor. And the medical records are, frankly, have very little history up until Dr. Newman, the Section 12 examiner on behalf of the Petitioner, causally relates her job duties to the work. There's no question there. Nonetheless, we believe that if it's a question of whether Petitioner met her burden, that the evidence was there. The Petitioner, the employer had a Section 12 examiner, too. That's correct. And Dr. Anderson, is that right? That's correct. And he opined that there was no causal connection. That's correct. And the only physician who opined there was a causal connection was your Section 12 examiner. That's correct, Your Honor. And, you know, in its opinion, the Commission didn't say the Petitioner failed to meet her burden because she didn't prove some quantitative evidence. What the Commission said was, we're going to discount the opinion of the Petitioner's Section 12 examiner because he didn't demonstrate that he understood what she did in her job and how often she did it. Respectfully, Your Honor, I don't read the decision that way. I read it as a failure of proof on behalf of the Petitioner in advising the doctor and, therefore, the doctor opining that there were quantitative aspects to her job that caused the symptomology. Well, the arbitrator specifically said, quote, the arbitrator finds that Dr. Newman does not provide a sufficient basis for his causation opinion, close quote. I mean, it doesn't say the Petitioner failed to prove. It says Dr. Newman doesn't. Well, if you look further in the decision when they reference Dr. Anderson's failure to watch the video, it sounds like they're saying there's a wash with respect to which doctor saw the video and understood really what it was. Well, if there's a wash, who has the burden of proving recovery? The claimant does, doesn't it? We do, Your Honor. But what I'm stating here is that the burden was elevated by the Commission. By requiring certain aspects, by saying these are the things that you have to prove in repetitive trauma cases, that runs counter to Well, he opines, what's wrong with that? You're going to go on and testify at arbitration and you have a claimant who puts books on a shelf. We want to recover under repetitive trauma, and we're not going to say what these books are, how much they weigh, how often you put on the shelf. This is somebody who puts books on a shelf. Are you going to recover automatically because somebody puts books on a shelf? Well, in this instance, that wasn't the sole testimony, or that wasn't the sole evidence, that it was just There was one on Newman's report. The Commission, let me just confront you with this. The Commission noted there was no evidence, no evidence, in Dr. Newman's report that he was aware of the average weight of the books, which is relevant, the frequency with which the claimant reached with their arm, the frequency with which he performed overhead lifting, and he didn't review the video. There's no evidence he reviewed the video job description. So how valuable is his testimony if all of those traditional elements are missing? I don't think they're traditional elements, Your Honor. I think the Commission's wrong in requiring those elements to prove a repetitive trauma. Hold on a second. All they did was discount your expert. They said we're not giving any weight to his opinion. Why? He didn't know what she did. That's not what they said, Your Honor. I'll read it to you. This is what they said. The arbitrator finds that Dr. Newman does not provide a suspicion basis for his causation opinion. The arbitrator asked, overhead lifting of any weight, question mark, any frequency of reaching, question mark. There is no evidence, Dr. Newman's, in Dr. Newman's report, that he was aware of the average weight of an Evanston Library book, or the frequency with which the petitioner reached with her arm, or the frequency with which the petitioner performed overhead lifting with her right arm. There is no evidence that Dr. Newman reviewed the video job description. Now, that's what they said. They discounted him because they said he didn't give any basis for his opinion. And therefore, we're going to rely on the opinion of Anderson, which they have every right in the world to do. And relying on the opinion of Anderson, they say that your client failed to establish a causal relationship. I don't understand where you claim that they put her to a burden. She shouldn't have. I think if they would have just discounted Dr. Newman altogether, that would have been different. But you just don't like the reason they discounted him? The reasoning elevates the burden. Why? Because the reading of this case now is that in repetitive trauma cases, you better, these are, these are quantitative aspects, and this counts. Counsel, if that argument were valid, you'd be in here arguing every time somebody, the commission, requires an expert to have a basis for his opinion, that that's an elevation of a burden. That's not the law. It has never been the law. The value of his opinion is based upon what he bases it on. The weight to be given is determined by what he bases it on. They asked him. He didn't know. He doesn't know anything. There's nothing new about retained experts making sure your retained expert knows all the facts, because they're going to be subject to cross-examination. The retained expert in this instance, Your Honor, understood the book-shelving job to consist of overhead reaching and overhead lifting. And Dr. Newman opined that that are common, two common ideologies for this type of condition. That was enough for Dr. Newman. Regardless of how many times it's done. See, your argument is that the repetitive nature of the work is irrelevant. You just said that's what you, that's your code word for your requiring quantitative number of points, which I think the law doesn't support you. You seem to be saying, distilled to its finest terms, if somebody puts books on a shelf, am I missing something? The number of times they do that in the course of a day doesn't matter, because if you get into that, you're requiring a higher burden from the claimant. Is that what you're saying? Well, Your Honor, there's no evidence that Dr. Newman didn't know, that he assumed that she did this on one occasion. No, if there's evidence he didn't know. Exactly. He simply didn't know. And what you've got here, neither did Anderson, by the way. And the commission turned around and said, Newman doesn't know, Anderson doesn't know, failure-proof. End of story. And that's exactly what happened here. Dr. Newman understood her job duties to be that of a bookshelver. Everybody knows that, okay? Does anybody dispute? Anderson understood that, too. He understood she was a bookshelver. He didn't know any more than Newman did how many times she had to shelve a book. And so what the commission said, a pot's on both your houses. You failed to prove causation. End of story. I think the reason why Darling was concerned about having a quantitative component, a quantitative requirement elevating the, is because there's no spectrum here. How much is enough? How much evidence? Well, one book isn't enough, is it? One book enough? Then it's not repetitive trauma, is it? You know, we've been dancing around. Let me ask you. You're going to lose on that point. I think you should get to the point of whether there's any other evidence in the record that would support causal connection. You're going to lose on this business that there's some elevated burden of proof. A chance to save yourself. What do you, can you tell us succinctly what you think had to be proven in this case to recover? If the number of times of the activity, the height of the shelves, the heaviness of the books doesn't matter in a repetitive trauma case, what do you think is what you needed to prove? That she shelved books. Is that what you're saying? Your Honor, the height of the shelf was proven. It was absolutely relevant, and it was proven. There were pictures in the record. All right. Was it proven how many times she did this in a day, and was the evidence to establish the weight of these books? You've acknowledged that Newman didn't know those factors. The... So what did you think you had to prove here? So with the tightly packed books, I think that proved the effort or the rigor with which she had to shelve the books. I think that... Was she doing it once a day or 100 times a day? Her testimony was that this was her job. That was clear. There was no testimony in the record that she did this on one occasion. This was, she was a book shelver. She did this on a regular basis. And in 2000... How does anybody know what that means, on a regular basis? 10 times a day, 150? In the record, our theory was that in this, the beginning of 2007, this is when her workload doubled up. This is when the books from the... Doubled up from what to what, would be my question. Doubled up from what? That's meaningless to say that doubled up. Well, she had been doing this job for 14 years prior, and there's an absence of symptomology for 14 years. Then when the books double up, and the books are packed tightly, this is when she starts to experience shoulder pain. This is our, this is, like I said, it's as close as to a specific incident... You told me that was a swimmer, too? She's a swimmer. That's correct. She does a lot of activities, reaching and stretching, right? But she'd be swimming, she'd been swimming prior to 2007. And she swam with both arms. This wasn't, even the commission never picked up on that this, as the city of Evanston did, that this was what caused the condition. Well, we're picking up on it, maybe. Isn't there a lot of reaching and stretching when you're swimming a lot? I would, I would submit that if bilaterally she had the same condition bilaterally, that would make sense. But in this instance, she had been a swimmer before. The dominant arm, the arm with which she shelves, is the arm that became symptomatic. At the same time, that her workload doubled as far as the shelving is concerned. Granted, she had other job duties, but the shelving is what the reaching and the lifting, the overhead lifting is, according to Dr. Newman, is what caused this condition, the symptomology, and brought about the symptomology, therefore requiring surgery. If there's no further questions, thank you. Thank you, counsel. Counsel, you may respond. May it please the court, counsel, Timothy McNally on behalf of the city of Evanston. Thank you, counsel. I'm going to ask a question and I'll try to be brief here. This case does involve a simple failure of proof. The commission did exactly what the commission is supposed to do. It weighed all of the evidence. Now, appellant relies on the Darling decision for the proposition that quantitative evidence is not required. And I'm in agreement that it's not required as a matter of law. It's not. That's not my position throughout the course of this case. It's not my position here today. But the Darling case also says that particularly in cases where the motion complained of is common to the general public, such as here, reaching, the commission may place great weight on that type of evidence. And that's what the commission did here is they weighed all of the evidence, including the lack of any evidence on the issue of the repetitiveness of job duties. Does the record ever establish anywhere how often she was putting these books on the shelf? It does not. And I would further that point and state that the record does establish that her job duties vary a great deal. We have it established that she performs cleaning activities. She sits at a computer and logs in books. She magnetizes books using a scanner. She puts books on a small shelf, and when she does do shelving, it can be all the way from her foot level all the way on up with only one shelf with the use of a stool. Nobody is disputing that in the course of a day she puts books on a shelf. You're not disputing that, are you? She's a shelver. I can't dispute that. But I would agree with you that nowhere in the record is there evidence of a repetitive job task. We look at Dr. Newman's report, and all he says is overhead reaching, forward reaching. That's it. Based on the record, that's all we know. And Petitioner's testimony doesn't further that evidence a great deal. That's really all we have. All we have here is evidence of varied job duties, no evidence of a repetitive job task. What about his argument who work doubled at a certain point? What does that mean to you, who work doubled? First of all, I don't think the doubling of books equates to a torn rotator cuff tear. And that's all the proof there really is, is they're saying that the books doubled. Secondly, there's no proof that she was in charge of handling all these books, and, again, we don't know how many books there are. And, again, we don't know what this doubling means. It's in the abstract, right? Correct. And I think most importantly, and this is something the Commission noted, is that this theory of the tightly bound books is contained nowhere in the medical records. The experts didn't consider it. It was apparently presented for the first time in arbitration almost five years after the manifestation date. While counsel relies on Darling, I think this case is far more like the Williams case, wherein the Court upheld a denial of compensation. In that case, the Court noted, the Court actually surveyed the cases where compensation was warranted and said in each of those cases, the claimant conclusively established a repetitive job test. We don't have that here. We don't have that here. We have varied job activities, no evidence of a repetitive job test, and divergent medical opinions, and the Commission weighed all of that evidence, as they're supposed to do, and their decision was not against the manifest weight of the evidence. Unless there are any questions, I would ask that you affirm the decision in its entirety. I don't believe there are. Thank you, counsel. Thank you. Very good. Well, thank you, counsel, both for your arguments in this matter. It will be taken under advisement that this position shall issue. The Court will stand in recess until 1-33.